**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Frank Konarski, husband; et al., | No. CV 11-612-TUC-LAB |
| Plaintiffs, | **ORDER** |
| vs. | |
| City of Tucson, a body politic; et al., | |
| Defendants. | |

Pending before the court is the defendants' motion for partial summary judgment filed on September 14, 2017. (Doc. 217) The plaintiffs filed a response and the defendants filed a reply. (Doc. 226); (Doc. 251)

The plaintiffs in this case provide housing to low income tenants. (Doc. 1-6) The defendant City of Tucson (the City) is the local housing authority that administers the federal Section 8 housing program, which gives rental assistance to low income families. *Id*. The individual defendants, Albert Elias, Peggy Morales, and Julianne Hughes, worked for the City when the events that triggered this action occurred. *Id*.

In May of 2010, the City vetted the plaintiffs' housing units and agreed to enter into housing assistance payment (HAP) contracts with the plaintiffs for the benefit of three prospective tenants. (Doc. 1-6) In June of 2010, however, the City notified the plaintiffs that it was rescinding the HAP agreements. *Id.* Subsequently, the plaintiffs brought this action for

breach of contract, bad faith, intentional interference with contract, intentional infliction of emotional distress, conspiracy, and violation of civil rights. *Id.*

On September 14, 2017, the defendants filed the pending motion for partial summary judgment. (Doc. 217) They argue they are entitled to summary judgment on the "class of one" equal protection claim and the City is entitled to summary judgment on the *Monell* claim. *Id.*

Magistrate Judge Bowman presides over this case having received written consent from all parties. 28 U.S.C. §636.

Summary judgment is granted for the City itself on the *Monell* claim. Summary judgment is otherwise denied.

Factual[1] and Procedural Background

The plaintiffs are landlords, who rent housing to low income tenants. (Doc. 218, p. 2, ¶ 2) In May of 2010, prospective tenants Bonita Baltazar and Guadalupe Caballero expressed a desire to rent from the plaintiffs. *Id.*, ¶ 3 The plaintiffs submitted to the City the paperwork necessary to apply for federal Section 8 rental assistance. *Id.* The City performed the necessary housing inspections, and agreed to enter into housing assistance payment (HAP) contracts with the plaintiffs. (Doc. 1-6, p. 5); (Doc. 218, p. 5, ¶ 14)

On June 2, 2010, however, the plaintiffs received a letter from Peggy Morales, the City's Section 8 administrator. (Doc. 218, p. 2, ¶ 4; p. 4 ¶ 10; p. 5, ¶ 16) That letter informed the plaintiffs that the HAP contracts "were improvidently signed and will not be processed. The third property . . . inspected May 21, 2010 will be voided." (Doc. 218, p. 2, ¶ 4; p. 4 ¶ 10; p. 5, ¶ 16)

---

[1] For convenience, the facts of the case are recounted primarily from the point of view of the City. There remain many factual disputes, but the vast majority of those disputes have no effect on the resolution of the motion, so those disputes are not addressed. If a dispute is material, the court addresses that dispute in the body of the order.

- 2 -

There is a long history of litigation between the parties. More than ten years earlier, the City sent the plaintiff Frank Konarski a letter stating that "due to the numerous complaints expressed by the tenants and the continuing problems imposed on our staff," the City would no longer initiate new contracts with him. (Doc. 218, pp. 2-3, ¶ 6) In November of 1994, the Arizona Attorney General's office found that Konarski had "engaged in unwelcome and unsolicited verbal conduct of an ethnic nature which was sufficiently severe and pervasive as to create a hostile, intimidating and offensive living environment" for Hispanic Section 8 tenants. (Doc. 218, p. 3, ¶ 7) In May of 2001, Adolph Valfre, who was Section 8 administrator at the time, informed Konarski's attorney that the plaintiffs were no longer eligible to participate in the Section 8 program due to "numerous complaints of discrimination from Konarski's tenants, Konarski's citation for assaulting a tenant, four failed Section 8 inspections in the previous four months, Plaintiffs' continued failure to bring their leases into compliance with the Arizona Residential Landlord Tenant Act, and Konarski's history of abusive, argumentative, accusatory, and abrasive behavior toward City HAP employees." (Doc. 218, pp. 3-4, ¶ 9)

The individual defendant, Peggy Morales, succeeded Valfre as the City's Section 8 administrator. (Doc. 218, p. 4, ¶ 10) Morales was aware of Konarski's problematic history and supported Valfre's 2001 decision to disqualify the plaintiffs from participation in the Section 8 program. (Doc. 218, pp. 4-5, ¶ 11, 12, 13)

In June of 2010, Morales discovered that, in the previous month, her office had approved three HAP contracts with the plaintiffs. (Doc. 218, p. 5, ¶ 14) She sent a letter to the plaintiffs informing them that the contracts "were improvidently signed and will not be processed." (Doc. 218, p. 5, ¶ 16) Morales informed the prospective tenants that the City would not subsidize their rent if they chose to stay at the plaintiffs' property but they could be eligible for rental assistance if they chose to rent from a different landlord. (Doc. 218, p. 5, ¶ 17)

Morales maintains that the contracts were voided because of the City's earlier decision to disqualify the plaintiffs from participation in the Section 8 program. (Doc. 218, p. 5, ¶ 14) The plaintiffs assert, to the contrary, that the contracts were voided without a rational basis.

They base their argument on the testimony of Bonita Baltazar, one of the prospective tenants.

On June 4, 2010[2], Morales wrote Baltazar explaining that the City was canceling the HAP agreement and inviting her to come to her office and obtain a new voucher packet. (Doc. 218, pp. 5-6, ¶ 18) Baltazar subsequently told Konarski that she spoke to Morales, who said she "had a personal vendetta against him." (Doc. 218, p. 6, ¶ 19) Morales denies telling Baltazar that she had a "personal vendetta" against Konarski. (Doc. 218, p. 6, ¶ 20)

On June 7, 2010, Baltazar signed an affidavit prepared by Konarski. (Doc. 218, p. 6, ¶ 21) The affidavit does not mention the "personal vendetta" accusation. (Doc. 218, p. 7, ¶ 24)

On July 10, 2010, Baltazar spoke at a Tucson City Council meeting. (Doc. 218, p. 7, ¶ 25) She stated that Morales told her that "there was a personal vendetta between her and . . . Frank [Konarski]." (Doc. 218, p. 7, ¶ 25) Konarski and his son had driven Baltazar to the Council meeting and had given her a piece of paper that contained a statement prepared by Konarski. (Doc. 218, p. 8, ¶¶ 27, 28) In the videotape of the Council meeting, Baltazar can be seen referring to a piece of paper while she spoke. (Doc. 218, p. 7, ¶ 26) But later, at her deposition, Baltazar testified that she read the paper for the first time when she went home after the meeting. (Doc. 218, p. 8, ¶ 29) After the deposition, she tried to find the paper, but was unable to do so. (Doc. 218, pp. 8-9, ¶ 32) Konarski maintains that the only paper he gave to Baltazar on the day of the hearing was a copy of her affidavit. (Plaintiffs' response, Exhibit B, ¶ 30)

The plaintiffs subsequently initiated this action by filing a complaint in Pima County Superior Court. They filed an amended complaint on August 30, 2011, claiming breach of contract, bad faith, intentional interference with contract, intentional infliction of emotional distress, conspiracy, and violation of civil rights pursuant to 42 U.S.C. § 1983. (Doc. 1-6) On September 26, 2011, the defendants removed the action based on this court's federal question jurisdiction, 28 U.S.C. § 1331. (Doc. 1, p. 2)

---

[2] Some of these dates are in dispute.

- 4 -

On May 31, 2012, the defendants filed their first motion for partial summary judgment. (Doc. 22) They explained that in 2001, the City told Konarski that "due to numerous complaints that had been expressed by the tenants and also because of continuing problems imposed on its staff" the City would no longer approve Section 8 housing contracts with him. (Doc. 22, p. 8) (punctuation modified) The defendants argued that the Section 8 contracts in this case were denied in accordance with that prior determination. (Doc. 22) This court granted the motion, in part, denying the plaintiffs' civil rights claims and remanding the action to state court. (Doc. 90)

On appeal, the Ninth Circuit reversed, in part, holding that Baltazar's "personal vendetta" allegation creates a genuine issue of material fact precluding summary judgment on the plaintiffs' "class-of-one" equal protection claim. (Doc. 99-1) If credited by the trier of fact, this statement[3] could support the plaintiffs' claim that the HAP agreements were canceled without a rational basis. *Id*. The court explained: "When evidence tends to show that an otherwise rational basis is pretext for genuine animosity, summary judgment is improper." (Doc. 99-1, p. 4) The Ninth Circuit apparently recognized that the City's prior determination that Konarski was a problematic landlord would constitute a rational basis for canceling the agreements. But it allowed for the possibility that this explanation for the City's action could be a pretext concealing a different, improper reason for the decision. The action was then remanded to this court. The parties have since engaged in further discovery.

On September 14, 2017, the defendants filed the pending motion for partial summary judgment. (Doc. 217) They argue they are entitled to summary judgment on the "class of one"

---

[3] The word "vendetta" is defined as a "blood feud" or "an often prolonged series of retaliatory vengeful or hostile acts or exchange of such acts." *Merriam-Webster's Collegiate Dictionary*, 10th ed., p. 1310. The Ninth Circuit assumes that the word may be used to denote an irrational or unreasonable personal animus. Morales denies using this word, but even if she did, the plaintiffs must prove that she used it in this manner.

1 | equal protection claim and the City itself is entitled to summary judgment on the *Monell* claim.
2 | *Id*. The plaintiffs filed a response and the defendants filed a reply. (Doc. 226); (Doc. 251)

A hearing on the motion for summary judgment was held on May 8, 2018.

Standard of Review: Summary Judgment

Summary judgment is available only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986).

The initial burden rests on the moving party to point out the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986). "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010).

Once initially satisfied, the burden shifts to the nonmovant to demonstrate through the production of probative evidence that an issue of fact remains to be tried. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553. "If a reasonable jury viewing the summary judgment record could find by a preponderance of the evidence that [the plaintiffs are] entitled to a verdict in [their] favor, then summary judgment [is] inappropriate; conversely, if a reasonable jury could not find liability, then summary judgment [is] correct." *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1027-28 (9th Cir. 2006).

"In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d

1  978, 984 (9th Cir. 2007). "Rather, it draws all inferences in the light most favorable to the
2  nonmoving party." *Id.*

Discussion: Class-of-One

The defendants (collectively, the City) argue first that the plaintiffs' class-of-one equal protection claim should not be recognized in this context because the City's decision to cancel the HAP contracts was a matter of discretion that is not amenable to class-of-one analysis citing *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 598, 128 S. Ct. 2146, 2151 (2008). The court does not agree with the City's reading of that case.

In *Engquist*, the Supreme Court held that the class-of-one equal protection theory did not apply to a plaintiff complaining that she was fired by the Oregon Department of Agriculture for "arbitrary, vindictive, and malicious reasons." *Engquist*, 553 U.S. at 595, 128 S. Ct. at 2149. The Court based its holding on the fact that the government is imbued with special powers when it exercises its authority as an employer. The Court stated, "there is a crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate or license, as lawmaker, and the government acting as proprietor, to manage its internal operation." *Engquist*, 553 U.S. at 598, 128 S. Ct. at 2151 (punctuation modified).

In the pending case, the class-of-one equal protection claim revolves around the City's decision to rescind the HAP contracts. This was not an employment decision, but a decision made by the City in its role as administrator. Accordingly, the court finds *Engquist* is distinguishable.

The City further argues that the decision to rescind the HAP contracts was a matter of "discretionary decision making based on a vast array of subjective, individualized assessments." *Engquist,* 553 U.S. at 603, 128 S. Ct. at 2154. It was therefore inherently impossible to treat everyone alike and the class-of-one claim has no application. This argument, however, assumes something about the decision to rescind that this court may not assume at the summary judgment stage.

This argument assumes that the decision to rescind the HAP agreements was made as an exercise of discretion based on careful evaluation of Konarski's problematic past behavior. The plaintiffs, however, have presented evidence, namely the "personal vendetta" allegation, from which one could find that the decision to rescind the agreements was made, not as an exercise of discretion, but for unrelated reasons of personal animosity. The court therefore cannot find that the decision to rescind the HAP agreements was a genuine exercise of discretion and outside the purview of the class-of-one equal protection theory. If the trier of fact should eventually determine that the HAP agreements were canceled because of Konarski's problematic past behavior, that presumably would constitute a rational basis and the plaintiffs' claim would fail at that time. *See Konarski v. Valfire*, 67 F. App'x 458, 459 (9th Cir. 2003) (The City's refusal to initiate new Section 8 housing contracts did not violate the Konarskis' due process rights); *Konarski v. City of Tucson*, 289 F. App'x 242, 244 (9th Cir. 2008) (The Konarskis cannot relitigate their claim that they have a protected right to participate in the Section 8 program.). At the motion hearing, the plaintiff Frank E. Konarski argued that this prior determination by the City was not made by a court of law or was otherwise unfair. *See also* (Doc. 226-1, pp. 4-6, PCSOF 2) This issue, however, has already been decided, and the plaintiffs are precluded from litigating it anew. *Id*.

The City further argues that it is entitled to summary judgment on the class-of-one equal protection claim because the plaintiffs fail to identify similarly situated landlords who were treated more favorably without a rational basis. (Doc. 217, pp. 13-16)

To make out a class-of-one equal protection claim, the plaintiff must allege that "she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 1074 (2000). For example, in *Olech*, the plaintiff alleged that the Village of Willowbrook "intentionally demanded a 33-foot easement as a condition of connecting her property to the municipal water supply where the Village required only a 15-foot easement from other similarly situated property owners." *Olech,* 528 U.S. at 565, 120 S. Ct. at 1075. In that

case, the plaintiff identified similarly situated property owners, who were allegedly treated differently for reasons that were "irrational and wholly arbitrary." *Id*.

Here, the City argues that the plaintiffs failed to identify similarly situated landlords "with a comparable history of discrimination against tenants, non-compliance with ARLTA [Arizona Residential Landlord Tenant Act], failed Section 8 housing inspections, and aggressive behavior who the City approved as Section 8 landlords." (Doc. 217, p. 14); *see, e.g., Prime Healthcare Servs., Inc. v. Harris*, 216 F. Supp. 3d 1096, 1117 (S.D. Cal. 2016) ("Prime fails to allege facts showing that it was similarly situated to other buyers of nonprofit hospitals."). Again, the City bases its argument on an initial assumption that this court cannot make.

The City assumes that the HAP agreements were canceled as an exercise of discretion based on careful evaluation of Konarski's problematic past behavior. It then challenges the plaintiffs to show that this decision was irrational by identifying other problematic landlords who were treated more favorably. But as explained above, the court cannot make the City's initial assumption. Bonita's "personal vendetta" testimony creates a genuine issue of material fact as to why the HAP agreements were canceled. They could have been canceled because of Konarski's past behavior, or they might have been canceled for arbitrary and capricious reasons as yet unidentified. The plaintiffs' failure to identify other problematic landlords who have been treated more favorably does not doom their class-of-one claim.

In this case, the plaintiffs have identified similarly situated property owners who were treated differently. They are the property owners who received HAP agreements and did not have those agreements subsequently canceled. For their claim to succeed, the plaintiffs must persuade the trier of fact that this difference in treatment occurred without a rational basis. *See also, Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013) ("If animus is readily obvious, it seems redundant to require that the plaintiff show disparate treatment in a near exact, one-to-one comparison to another individual.").

Discussion: *Monell*

- 9 -

The City further argues it is entitled to summary judgment because there is no evidence establishing liability for the City itself pursuant to *Monell v. Department of Social Services*, 436 U.S. 658, 690-691 (1978). In this action, the plaintiffs claim, pursuant to 42 U.S.C. § 1983, that the defendants acted under color of state law when they violated the plaintiffs' rights to equal protection. (Doc. 1-6, pp. 12-13) In *Monell*, the Supreme Court explained that municipalities are not vicariously liable under § 1983 for their employees' actions. They are liable only for their own illegal acts. For example, a municipality is liable if the plaintiff can show that he suffered a depravation of rights due to an official municipal policy. "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350, 1359 (2011).

The City argues that the plaintiffs have not identified a "formal policy or informal practice or custom" behind the alleged illegal decision to cancel the HAP agreements. (Doc. 217, pp. 16-17)

In their response, the plaintiffs argue City liability under three theories: (1) Morales is a policymaker and therefore her actions result in liability for the City; (2) Elias is a policymaker and he ratified Morales' actions or was deliberately indifferent to them; and (3) the City Council members are final policymakers, they knew of the illegal actions, and they permitted the harm to occur. (Doc. 226, pp. 16-17)

"Whether an official has final policymaking authority is a question for the court to decide based on state law." *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999). In deciding the question "courts consider whether the official's discretionary decision is constrained by policies not of that official's making and whether the official's decision is subject to review by the municipality's authorized policymakers." *Id*. at 1236–37 (punctuation modified).

The plaintiffs first argue that Morales was a policymaker and therefore her actions result in liability for the City. They assert that Morales testified in her deposition that "she was a

- 10 -

policy maker, being in the position to 'formulate policy' on behalf of Defendant City." (Doc. 226-1, p. 72, PCSOF 53)

In fact, at her deposition, Morales explained that she worked under a supervisor, Albert Elias. (Doc. 226-4, p. 25) She was asked, "And is it your function or Mr. Elias' function to formulate policy with respect to the administration of the HUD Program?" (Doc. 226-4, p. 25) She stated "I would formulate the policy, and he would review and either accept or deny." (Doc. 226-4, pp. 25-26) Based on this testimony, the court concludes that Morales's "decision[s] were subject to review," and therefore she did not have final policymaking authority. *Christie*, 176 F.3d at 1236-37.

Morales testified at her deposition that she was the one who actually decided to cancel the HAP contracts "in consultation with our attorney and with my boss, Albert Elias." (Doc. 226-4, p. 61) This is evidence that Morales was permitted to exercise discretion in the awarding and rescinding of the HAP contracts. The discretion to *implement* policy, however, is not the same as the authority to *create* policy. *Christie*, 176 F.3d at 1236. That Morales had the discretion to cancel the HAP contracts does not prove that she was a policymaker. The court concludes that Morales was not policymaker.

The plaintiffs further argue that Elias was a policymaker and he ratified Morales's actions or was deliberately indifferent to them. They support their argument by referring to Morales's deposition in which she stated that "Elias . . . was in a position to review, and either accept or deny [her] formulated policy." (Doc. 226-1, PCSOF 54) This testimony is evidence that Morales was *not* a policymaker, but it is not evidence that Elias *was* a policymaker. To prove Elias was a policymaker, the plaintiffs must provide evidence that his policy decisions were *not* subject to review. They have not done so. Morever, even assuming that Elias was a policymaker, they have not shown that Elias ratified Morales's actions.

Where a policymaker learns of an illegal action after the fact, liability attaches to the municipality only if the policymaker "ratifies" the subordinate's action. "To show ratification, a plaintiff must prove that the authorized policymakers approve a subordinate's decision and

- 11 -

the basis for it." *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999). "[I]t is well-settled that a policymaker's mere refusal to overrule a subordinate's completed act does not constitute approval." *Id.*; *see also Weisbuch v. County of Los Angeles*, 119 F.3d 778, 781 (9th Cir. 1997).

The plaintiffs argue Elias "made an express approval" of Morales's act and points to his statement that her decision was the "position" of the department. (Doc. 226, p. 17) (citing to PCSOF 61); see also (Doc. 226-5, pp. 66, 68) Apparently, the plaintiffs sent an email to Elias in which they complained that Morales illegally terminated the HAP contracts and asked him to override her decision. (Doc. 226-5, pp. 66) Elias sought input from Julianne Hughes, Peggy Morales, and Olga Osterhage on the request. (Doc. 226-5, pp. 66) He then informed the plaintiffs that "[t]he letter you received from our Department is quite clear and speaks for itself." (Doc. 226-5, pp. 68) The court finds that while Elias knew about Morales's decision to terminate the HAP contracts and considered the issue, there is no evidence that he actually "approve[d] [his] subordinate's decision and the basis for it." *See Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999). At best, the plaintiffs can show that Elias knew about the decision; invited input from Hughes, Morales, and Osterhage; and then failed to overrule it. That is not enough to prove ratification. *Id.*

The plaintiffs further argue that Elias was deliberately indifferent to Morales's allegedly illegal actions, and this is a substitute for ratification. (Doc. 226, p. 17) They argue Elias "had knowledge of his last chance to help Plaintiffs and their tenants before it would get out-of-hand for the City." (Doc. 226, p. 17) (punctuation modified) (citing *Christie*, 176 F.3d at 1241) The plaintiffs misread *Christie*. Deliberate indifference can result in liability for a municipality if it occurs prior to the constitutional violation and causes that violation. *Christie*, 176 F.3d at 1241. Deliberate indifference is not a substitute for ratification, which occurs after the violation. Proof of deliberate indifference here is not enough. *See Konarski v. Tucson, City of*, 2016 WL 9782589, at *5 (D. Ariz. 2016), *aff'd sub nom.*, 2017 WL 5712132 (9th Cir. 2017).

Finally, the plaintiffs argue that the City Council members are final policymakers, that they knew of the illegal actions, and that they permitted the harm to occur. Baltazar informed

1 the City Council of the issue, and the plaintiffs sent email messages to the council members
2 seeking to resolve the issue. (Doc. 226-1, PCSOF 25, 55, 65) The court assumes without
3 deciding that the City Council members are final policymakers.

The plaintiffs' third argument fails for the reasons given above. At best, the plaintiffs can show that the City Council knew about the decision and failed to overrule it. That is not enough to prove ratification. *See Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999).

At the hearing, the plaintiffs argued that the HAP agreements were canceled in accordance with the City's long standing policy of not allowing them to participate in the Section 8 housing program. This, ironically, is the position of the City, and while this theory would make the City responsible for Morales's actions under *Monell*, it would cause the plaintiffs to lose their underlying equal protection claim.

If the plaintiffs prove that Morales canceled the HAP agreements due to the City's long standing policy against the plaintiffs, then the City would be liable for her actions under *Monell*. But, the City's long standing policy is a rational basis[4] for canceling the agreements, and the class-of-one claim would then fail. The only way the plaintiffs can win their class-of-one claim is by showing that the agreements were canceled without a rational basis, which means they

---

[4] It might be more accurate to state that the plaintiffs present no evidence from which the trier of fact could conclude the opposite, and for good reason. The Ninth Circuit has already decided that City's refusal to initiate new Section 8 housing contracts with the Konarskis does not violate their due process rights. *Konarski v. Valfire*, 67 F. App'x 458, 459 (9th Cir. 2003) And that decision cannot be relitigated in this action. *Konarski v. City of Tucson*, 289 F. App'x 242, 244 (9th Cir. 2008). The plaintiffs maintain that other landlords have committed even more egregious acts and they have not been banned from the program. (Doc. 226, pp. 10-11) While that might be true, it does not prove that the plaintiffs were banned without a rational basis. *See Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 945 (9th Cir. 2004) (The fact that other landowners were treated more leniently does not prove that the plaintiff was treated harshly without a rational basis absent proof that the other landowners were similarly situated.), *overruled on other grounds by Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 125 S.Ct. 2074 (2005); *see also Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 604, 128 S. Ct. 2146, 2154 (2008) (It is no defense to a speeding ticket to argue that others were also speeding and they did not get a ticket.).

- 13 -

must show that Morales canceled them, not because the City thinks Konarski is a problematic landlord (and has thought so since 2001), but for arbitrary and capricious reasons as yet unidentified. The plaintiffs must prove at trial that Morales harbors a genuine animosity for the plaintiffs that is separate from the City's long standing policy of not permitting them to participate in the Section 8 program. *See Squaw Valley Dev. Co.,* 375 F.3d at 948 ("[A]n equal protection violation may [not] be premised on animosity arising from a regulator's legal enforcement methods."). Accordingly,

IT IS ORDERED that the defendants' motion for partial summary judgment, filed on September 14, 2017, is GRANTED in PART. (Doc. 217) Summary judgment is granted for the City on the *Monell* claim. Summary judgment is otherwise denied.

DATED this 4th day of June, 2018.

*Leslie A. Bowman*
Leslie A. Bowman
United States Magistrate Judge

- 14 -